UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| BRENDAN REILLY and TIFFANY REILLY, <br><br> Plaintiffs, <br><br> vs. <br><br> PHILADELPHIA INSURANCE COMPANY, <br><br> Defendant. | **4:20-CV-4173-LLP** <br><br> **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION TO QUASH JURY DEMAND** |

Pending before the Court is Defendant Philadelphia Insurance Company's Motion for Partial Summary Judgment and Motion to Quash Jury Demand. (Docs. 17, 21). For the following reasons, Defendant's Motion for Partial Summary Judgment is granted in part and denied in part and Defendant's Motion to Quash Jury Demand is granted.

## BACKGROUND

### National Flood Insurance Program

Plaintiffs' property in Madison, South Dakota was insured by a Standard Flood Insurance Policy (SFIP) issued by Philadelphia Indemnity Insurance Company ("PIIC"), a private insurer participating in the National Flood Insurance Program ("NFIP") which was established pursuant to the National Flood Insurance Act of 1963, 42 U.S.C. § 4001. The NFIP was created because it was uneconomical for private insurance companies to provide flood insurance with reasonable terms and conditions to those in flood prone areas. *See* 42 U.S.C. § 4001(b); *Copeland v. Fed. Emergency Mgmt. Agency*, Civ. No. 03-2704, 2004 WL 325577, *1 (E.D. La. Feb. 18, 2004). In administering the NFIP, FEMA creates regulations that govern the process of adjusting and paying claims for flood loss. 42 U.S.C. §§ 4011, 4019. Exercising regulatory authority granted by 42 U.S.C. § 4081(a), FEMA established the Write-Your-Own ("WYO") program in 1983, whereby private insurance company participants would issue Government-designed Standard Flood Insurance Policies ("SFIPs"), charge premiums on behalf of the Government, adjust claims arising under the SFIPs, and defend against related legal actions. *See McGair v. Am. Bankers Ins. Co. of*

1

*Fla.*, 693 F.3d 94, 96 (1st Cir. 2012). The NFIP establishes private insurers as "fiscal agents of the United States," 42 U.S.C. § 4071(a)(1), and prohibits them from waiving, altering, or amending any provision of the SFIP without the express, written consent of the Federal Insurance Administrator. 44 C.F.R. § 61.13(d); (Docs. 20, ¶ 9; 27, ¶ 9). The Government, in return, reimburses the WYO insurer for claims paid under the SFIPs and related litigation costs, including defense costs, for the adjustment and payment of claims by private insurers in the WYO program, and pays the WYO insurer a flat 3.3% commission on claims paid. *See Grissom v. Liberty Mut. Fire Ins. Co.*, 678 F.3d 397, 402 (5th Cir. 2012); 44 C.F.R. pt. 62, app. A., art. III.D.1-2; *Stanton v. State Farm Fire & Cas. Co.*, 169 F.Supp.2d 1109, 1117 (D.S.D. 2001) (citing 44 C.F.R. Pt. 62, App. A, Art III(C)(1)).

Private insurers join the WYO program by entering into an agreement with FEMA, the details of which are codified in the "Arrangement," 44 C.F.R. Pt. 62, app. A. FEMA specified the terms of these Arrangements in the regulations governing the Program. *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 271 (3d Cir. 2004). The Arrangement requires companies to notify FEMA of litigation expenses and requires FEMA's Office of the Chief Counsel to ensure the litigation is based on actions within the scope of the Arrangement and does not involve agent negligence. *Grissom*, 678 F.3d at 402 (citing 44 C.F.R. pt. 62 app. A. art. III(D)(2)-(3)(a)). If FEMA's Chief Counsel, along with the Federal Insurance Administrator, determine "that the litigation is grounded in actions by the Company that are significantly outside the scope of [the] Arrangement, and/or involves issues of agent negligence" the Federal Insurance Administrator has thirty days to inform the insurer that the litigation expenses (in whole or in part) will not be covered. *Id.* (citing 44 C.F.R. pt. 62 app. A. art. III(D)(3)(a)-(d)). Unless FEMA explicitly notifies the insurance company of its intent not to defend or indemnify, FEMA is presumed to pay the litigation expenses and any resulting damages awards. *Id.*

**Philadelphia Indemnity Insurance Co.**

PIIC is a Write-Your-Own Program Carrier participating in the U.S. Government's National Flood Insurance Program ("NFIP") pursuant to the NFIA and is a signatory to the Arrangement written by FEMA. (Docs. 20, ¶ 1; 27, ¶ 1). PIIC maintains a segregated account of Federal flood insurance funds, as required by Article VI(B) of the Arrangement. (Doc. 20, ¶ 2; 27, ¶ 2). PIIC investigates, adjusts, settles and defends all claims or losses arising from the SFIPs

issued under the Arrangement.  (Docs. 20, ¶ 3; 27, ¶ 3).  All flood claim payments are binding upon the Federal Insurance Administration, as per Article III(F) of the Arrangement, and all flood claim payments by PIIC, the WYO carrier, are made directly with federal funds.  (Docs. 20, ¶ 3; 27, ¶ 3).  PIIC pays all claims payments under SFIPs with federal funds as stated at Article VI(B) of the Arrangement.  (Docs. 20, ¶ 4; 27, ¶ 4).  PIIC pays judgments rendered against it as a WYO flood carrier with federal funds unless the Federal Insurance Administrator determines that the claim falls significantly outside the scope of the Arrangement or involves an issue of agent negligence.  (Docs. 20, ¶ 5; 27, ¶ 5).

**Plaintiffs' Flood Insurance Policy**

On June 1, 2011, Plaintiffs applied for a SFIP for their seasonal dwelling located at 602 Best Point Dr., Madison, South Dakota 57402.  (Docs. 20, ¶ 10; 27, ¶ 10).  In its capacity as a WYO Program carrier, PIIC issued SFIP number 8704819483 to Plaintiffs for their seasonal dwelling and with a policy term from June 20, 2011 to June 30, 2012.  (Docs. 20, ¶ 11; 27, ¶ 11).  The SFIP provided building limits of $150,000 and contents limits of $60,000, each subject to $1,250 deductibles on the date of the flood at issue.  (Docs. 20, ¶ 14; 27, ¶ 14).  Plaintiffs renewed the SFIP annually for the next nine (9) years until June 30, 2020, when the SFIP expired.  (Docs. 20, ¶ 12; 27, ¶ 12).  In 2019, PIIC mailed Plaintiffs a renewal notice that allowed Plaintiffs to elect to renew their SFIP for the same coverage or to increase their coverage limits to $200,000 for their building and $80,000 for their contents.  (Docs. 27, ¶ 3; 33, ¶ 3; 30-1).

In case of loss, Plaintiffs' SFIP provides that:

J.      Requirements in Case of Loss

In case of a flood loss to insured property, you must:

1.  Give prompt written notice to us;
2.  As soon as reasonably possible, separate the damaged and undamaged property, putting it in the best possible order so that we may examine it;
3.  Prepare an inventory of damaged property showing the quantity, description, actual cash value, and amount of loss.  Attach all bills, receipts, and related documents;
4.  Within 60 days after the loss, send us a proof of loss, which is your statement of the amount you are claiming under the policy signed and sworn to by you, and which furnishes us with the following information:
    a.  The date and time of loss;
    b.  A brief explanation of how the loss happened;

3

     c.  Your interest (for example, "owner") and the interest, if any, of others in the damaged property;

     d.  Details of any other insurance that may cover the loss;

     e.  Changes in title or occupancy of the covered property during the term of the policy;

     f.  Specifications of damaged buildings and detailed repair estimates;

     g.  Names of mortgagees or anyone else having a lien, charge, or claim against the insured property;

     h.  Details about who occupied any insured building at the time of the loss and for what purpose; and

     i.  The inventory of damaged personal property described in J.3. above.

5.  In completing the proof of loss, you must use your own judgment concerning the amount of loss and justify that amount.

6.  You must cooperate with the adjuster or representative in the investigation of the claim.

7.  The insurance adjuster whom we hire to investigate your claim may furnish you with a proof of loss form, and she or he may help you complete it. However, this is a matter of courtesy only, and you must still send us a proof of loss within 60 days after the loss even if the adjuster does not furnish the form or help you complete it.

8.  We have not authorized the adjuster to approve or disapprove claims or to tell yo whether we will approve your claim.

9.  At our option we may accept the adjuster's report of the loss instead of your proof of loss. The adjuster's report will include information about your loss and the damages you sustained. You must sign the adjuster's report. At our option, we may require to swear to the report.

(Doc. 19-2 at 122). Plaintiffs' SFIP further provides that PIIC may, in its sole discretion "request, in writing, that you furnish us with a complete inventory of the lost, damaged or destroyed property, including: a. Quantities and costs; b. Actual cash values or replacement cost (whichever is appropriate); c. Amounts of loss claimed; d. Any written plans and specifications for repair of the damaged property that you can reasonably make available to us; and e. Evidence that prior flood damage has been repaired. (Doc. 19-2 at 122). Section VII(R) of Plaintiffs' SFIP provides:

> You may not sue us to recover under this policy unless you have complied with all the requirements of the policy. If you do sue, you must start the suit within 1 year after the date of the written denial of all or part of the claim and you must file the suit in the United States District Court of the district in which the covered property was located at the time of loss. This requirement applies to any claim that you may have under this policy and to any dispute that you may have arising out of the handling of any claim under the policy.

(Doc. 19-2 at 124).

**Plaintiffs' Flood Loss**

4

On September 13, 2019, Plaintiffs reported a claim to PIIC under their SFIP for damages to their insured property resulting from a flood, which occurred on or about September 11, 2019 and into September 12, 2019. (Docs. 20, ¶ 15; 27, ¶ 15; 27, ¶ 9; 33, ¶ 9). Plaintiff Brendan Reilly traveled to the property on September 13, 2019. (Docs. 27, ¶ 6; 33, ¶ 6). Mr. Reilly needed to park at a distant neighbor's residence and walk through water to get to his home. (Docs. 27, ¶ 6; 33, ¶ 6). According to Mr. Reilly, it "looked like our cabin was in the lake. . . " and he believed the water was "knee high" on this date. (Docs. 27, ¶ 7; 33, ¶ 7). The standing water stayed in Plaintiffs' dwelling for 13 days. (Docs. 27, ¶ 8; 33, ¶ 8).

PIIC acknowledged the flood claim and assigned the loss to an independent adjusting firm, Colonial Claims Corporation pursuant to Article VII(J)(7) of the SFIP. (Docs. 20, ¶ 16; 27, ¶ 16). The claim was assigned to independent adjuster Jerrold Hill. (Docs. 20, ¶ 16; 27, ¶ 16). At the time the claim was reported, another Colonial adjuster, Robert Holmes, was working in the area and met with Mr. Reilly on September 25, 2019, to conduct an inspection of the property. (Docs. 20, ¶ 16; 27, ¶ 16). Mr. Reilly was accompanied during the inspection by local contractor Jason Seykora who had done some work for Plaintiffs previously. (Docs. 27, ¶ 10; 33, ¶ 10; 29-2, Reilly Dep. 39:24-40:3). When Mr. Holmes entered the building, he concluded that he was seeing "an extraordinary flood claim." (Docs. 27, ¶ 11; 33, ¶ 11). Holmes concluded it was "extraordinary" because mold had grown throughout the property higher than 48 inches from the floor due to an inability to access the house to start the mitigation process. [1] (Docs. 27, ¶ 11; 33, ¶ 11; Holmes Dep. 41:18-22). Holmes determined that Plaintiffs' property had been inundated with approximately 14 inches of water on the exterior and 18 inches of water on the interior of the dwelling for approximately 13 days. (Docs. 20, ¶ 16; 27, ¶ 16).

After Holmes's inspection, independent adjuster, Jerrod Hill assisted Plaintiffs in presenting the claim pursuant to SFIP Art. VII(J)(7). (Docs. 20, ¶ 17; 27, ¶ 17). Mr. Hill asked Plaintiffs to prepare a list detailing the personal property that was destroyed by the flood and associated values. (Docs. 27, ¶ 13; 33, ¶ 13). Plaintiffs provided a list documenting their personal

---

[1] Mr. Holmes testified that with normally, with "14 inches of [standing] water, the flooring, and the walls are removed, the doors are removed, the cabinets are removed [and[ [t]he walls are removed only up to four feet." (Doc. 29-3, Holmes Dep. 41:5-9). However, Mr. Holmes testified that when mold has gone above four feet, the claim is classified as an "extraordinary" flood claim because they have to go above and beyond the normal scope of damages. (Doc. 29-3, Holmes Dep. 41:10-17).

property that was damaged by the flood and their estimated value and sent it to Mr. Hill by email on September 29, 2019. (Docs. 27, ¶ 13; 33, ¶ 13; 19-11 at 165). Mr. Hill acknowledged receipt of this email and asked for photos of some of the items listed by Plaintiffs as well as additional price verification listing the company name, brand, model, etc. so he could verify the pricing, especially for some of the higher priced items[2]. (Docs. 27, ¶ 14; 33, ¶ 14; 19-11 at 166). With regard to categories of goods lists such as "pots and pans" and "tools," Mr. Hill requested that Plaintiffs provide more details of the items and more photos. (Docs. 27, ¶ 15; 33, ¶ 15; 19-11 at 169). On October 7, 2019, Mr. Reilly responded to Mr. Hill with prices from an internet search of the products and photographs for many of the items Mr. Hill had requested. (Docs. 27, ¶ 15; 33, ¶ 15).

Sometime prior to October 22, 2019, Mr. Hill prepared an estimate of Plaintiffs' building losses, and sent Plaintiffs a proposed damages estimate in the amount of $83,314.12 (less than the $150,000 policy amount for building damages) for the repair of the dwelling—an estimate that Plaintiffs disagreed with. (Docs. 20, ¶ 17; 27, ¶ 17; 19-11 at 190; 19-16 at 237). Plaintiffs insisted that Mr. Holmes, the adjuster who inspected the property, had stated that the dwelling was not salvageable and would have to be knocked down and that the cost to rebuild would exceed the policy limits. (Docs. 19-16 at 237). Because Plaintiffs had raised concerns about possible structural damage, Hill requested an inspection of the dwelling by an engineer. (Docs. 20, ¶ 17; 27, ¶ 17; 27, ¶ 16; 33, ¶ 16; 19-8 at 158). On October 22, 2019, Erik Moore, engineer expert, inspected Plaintiffs' property. (Docs. 20, ¶ 17; 27, ¶ 17). In the report he issued after his inspection, Mr. Moore indicated that he was informed by Mr. Reilly that "[Mr. Reilly] had received information from the county building department that the house was required to be raised at least 4 feet from its current elevation due to the flood event." (Doc. 19-10 at 162). Moore stated in his report that there was "[n]o evidence of structural movement at the dwelling due to flooding," that "[t]he walls were relatively plumb over the handheld bubble level and no cracks were noted in the interior finishes to indicate structural movement." (Docs. 20, ¶ 17; 27, ¶ 17; 19-10 at 163). Moore's report stated further than "[r]epairs to the interior [were] technically possible but may not

---

[2]     Hill requested pricing verification for the following items: 1) a $3,500 patio set; 2) a $2,400 patio set; 3) a $7,000 leather sectional; 4) a $ 2,500 leather chair with recliner; 5) a $4,750 queen frame, box, mattress, headboard; 5) a $6,400 king bed frame; 6) a $360 king Company store sheet. (Doc. 19-11 at 169).

be economically feasible due to lack of mitigation and required elevation of the building." (Docs. 20, ¶ 17; 27, ¶ 17; 19-10 at 163).

During his deposition, Mr. Moore testified that during his inspection visit, he spoke to Mr. Reilly about the "need to do repairs as far as removing the wetted interior finishes and the moldy areas . . . and discussed [ ] the possibility of elevating the building." (Docs. 27, ¶ 18; 33, ¶ 18; 29-5, Moore Dep. 28:7-25).  Mr. Moore testified that "[w]e talked about possible cost, just roughly, of what needed to be done," and that he told Mr. Reilly that "it was more than likely going to cost more to repair the building than what it was possibly worth and that it may be more economically feasible to start over." (Doc. 29-5, Moore Dep. 28:7-9; 29:1-9).  Mr. Moore testified that once he became aware that the elevation requirements applied only to new and not existing construction, he testified that the structure was "salvageable" and "could have been saved" by "gutt[ing] the house down to the studs," drying the materials and mitigating for mold, and leaving the wall framing, the roof framing, and the floor slab, but that he did not know whether it "was cost-effective to do so."   (Doc. 34-4, Moore Dep. 30:21-31:2; 43:10-17, 55:9-22; 33, ¶ 19).

On November 4, 2019, Mr. Hill sent an email to Mr. Reilly containing Mr. Moore's engineer report. (Doc. 19-11 at 190).  Mr. Hill stated that Mr. Moore "did not find any additional damages" and that the building estimate therefore did not change. (Doc. 19-11 at 190).  In this same email, Mr. Hill stated that the price verification list that Plaintiffs had sent on October 7, 2019 was insufficient. (Doc. 19-11 at 190). Mr. Hill asked Mr. Reilly if he had original invoices for any of the higher priced items and asked whether it was possible to go back to where the items were purchased and see if they could print out an invoice. (Doc. 19-11 at 190).  Mr. Hill also asked whether it was possible to get a photo of the tags on the sectional, love seat and beds so that he could verify the brand of these items. (Doc. 19-11 at 190). Mr. Hill relayed that Plaintiffs had several options with regard to their claim for contents damages. (Doc. 19-11 at 190). If Plaintiffs could fully verify the brand, cost with actual invoice or tag verification, Mr. Hill stated that he could add these costs to the contents estimate. (Doc. 19-11 at 190).  If Plaintiffs were unable to do so, Mr. Hill stated that he could apply like kind and quality pricing for the items from FEMA's database or, once Plaintiffs completed their proof of loss form, Mr. Hill could include items still requiring verification in a denial request directly to the carrier and then Plaintiffs could appeal to the carrier. (Doc. 19-11 at 190-91).  Mr. Hill requested that Mr. Reilly review the contents

spreadsheet again and provide him with further verification so that Mr. Hill could add these contents to the claim. (Doc. 19-11 at 191). Mr. Hill advised Mr. Reilly that the 60-day deadline to submit their signed proof of loss form was rapidly approaching. (Doc. 19-11 at 191).

On November 7, 2019, Mr. Hill sent Mr. Reilly an email with an updated estimate for Mr. Reilly's review. (Doc. 19-11 at 192). Mr. Hill indicated in the email that the estimate included all remaining contents items that Mr. Reilly had requested payment on, but that he applied database pricing for some of the items because there was no documentation that Mr. Hill could use to verify the prices of some of these contents. (Doc. 19-11 at 192).[3] Hill also included several items in a denial request[4] which Plaintiffs could appeal. (Doc. 19-11 at 192). Hill's final estimate for building damages totaled $95,814.47 Replacement Cost Value ("RCV"). (Docs. 20, ¶ 20; 27, ¶ 20). After deducting the non-recoverable depreciation of $11,250.35 and the $1,250 deductible, the net total building claim was $83,314.12. (Docs. 20, ¶ 20; 27, ¶ 20). Hill's final estimate for contents damages totaled $28,648.89 RCV. (Docs. 20, ¶ 21; 27, ¶ 21). After deducting the non-recoverable depreciation of $7,422.86 and the $1,250, the net total contents estimate was $19,976.03.[5] (Doc. 20, ¶ 21; 27, ¶ 21).

On November 8, 2019, Plaintiffs emailed a Proof of Loss form, signed on November 8, 2019, to Jerry Hill at an incorrect email address. (Docs. 20, ¶ 24; 27, ¶ 24; 27, ¶ 21; 33, ¶ 21; 30-7 at 551-52). On November 11, 2019, Mr. Hill sent Mr. Reilly an email indicating that the next day, November 12th, was the 60-day deadline to submit the signed proof of loss. (Doc. 30-7 at 552). That same day, Mr. Reilly responded by forwarding two emails to Mr. Hill that he had inadvertently sent to the wrong email address. (Doc. 30-7 at 552). The first email that was

---

[3]     Mr. Hill indicated in his email to Mr. Reilly that he applied like, kind and quality pricing for the following items: patio set with round table and 4 chairs; leather sections with pullout bed and recliner; leather chair with recliner; king bed frame, box spring, mattress; king company store comforter; kind company store sheet. (Doc. 19-11 at 192).

[4]     Mr. Hill indicated in his email to Mr. Reilly that he included the following items in a denial request: patio set – 6 chairs, 2 ottomans, table, 2 side tables (I only see the 6 chairs in my photos and yours) I can include to cover if we can provide the photos); ATV helmet (Policy restrictions); 25 Life Jackets (Policy restrictions); Tools (No details . . . Need what is damaged item by item); Misc Supplies (No details . . . Need what is damaged item by item); Boat Stereo (Policy restrictions); Portable AC Unit in Bedroom (Do not see this item); Clothes (No details . . . Need what is damaged item by item). (Doc. 19-11 at 192-93).

[5]     Because the dwelling was not the primary residence of the insured, PIIC paid covered building damages on an Actual Cash Value basis as required by SFIP Art. VII(V)(4)(I). Contents or personal property damages were also paid on an ACV basis as required by SFIP Art. VII(V)(e). Actual Cash Value is defined under the SFIP as "[t]he cost to replace an insured item of property at the time of loss, less the value of its physical depreciation." (Doc. 34-1 at 593).

forwarded to Mr. Hill contained Plaintiffs' proof of loss form, signed on November 8, 2019. (Docs. 30-7 at 551-52; 20, ¶ 24; 27, ¶ 24; 27, ¶ 21; 33, ¶ 21). The Proof of Loss listed the actual cash value of the building structure as $200,000 and value for destroyed contents as $63,585. (Docs. 27, ¶ 22, 33, ¶ 22). The second email that Mr. Reilly forwarded to Mr. Hill supplemented Plaintiffs' proof of loss form with additional information. (Doc. 30-7 at 549). In the supplement, Mr. Reilly indicated that the basis of their claim for $200,000 in building damages were comments made by Mr. Moore, the engineer, during his inspection of the structure that repairs were not economically feasible and that stripping the structure down to the studs, raising the structure over 4 feet, and refinishing would cost at least $200,000. (Docs. 30-7 at 550; 27, ¶ 24; 33, ¶ 24).

After sending the proof of loss form and supplement to Mr. Hill, Mr. Reilly sent a follow-up email to Mr. Hill on November 12, 2019, to ensure he had received the Proof of Loss. (Docs. 27, ¶ 27; 33, ¶ 27). Mr. Reilly sent the emails out of concern that he may have sent his prior emails to an incorrect email address. (Docs. 27, ¶ 27; 33, ¶ 27). On November 12, 2019, Mr. Hill responded to Mr. Reilly indicating that he received the two emails forwarded by Mr. Reilly on November 11, 2019. (Doc. 30-7 at 549).

In Mr. Hill's final report dated November 11, 2019, he recommended that a portion of Plaintiffs' building claim for $200,000 to rebuild the structure be denied because the wall and ceiling framing, as well as the roof shingles and associated roof items, were not listed as damaged in the engineer report. (Docs. 19-15 at 234; Doc. 20, ¶ 23). Mr. Hill also recommended denying additional payments for particular contents on the basis that Plaintiffs were unable to provide documentation and recommended denial of particular contents that were not covered as well as contents that were not confirmed to be at the property at the time of the loss. (Docs. 20, ¶ 23; 27, ¶ 23). Mr. Hill requested that PIIC pay this claim with payment in accordance with his final estimates—$83,314.12 for building damages and 19,976.03 for contents damages. (Doc. 19-15 at 235).

On November 12, 2019, Mr. Hill submitted his final report to PIIC, along with his final building and contents estimate and Plaintiffs' proof of loss for review and approval. (Docs. 20, ¶ 24; 27, ¶ 24; 19-3, ¶ 24). PIIC revised and verified the adjustment and recommendations of the independent adjuster in compliance with 44 C.F.R. § 62.23(a)(2), and determined that the covered and payable amount of the claim pursuant to the terms of the SFIP was $83,314.12 for building

damages under Coverage A and $19,976.03 for contents damage under Coverage B.  (Doc. 20, ¶ 28; 27, ¶ 28).  Plaintiffs' proof of loss form was reported to Federal Insurance Administrator ("FIA") on November 14, 2019.  (Doc. 19-18 at 251).  PIIC filed a waiver with the FIA requesting a waiver in the amount of $83,314.12 in building damages and $19,976.03 in contents damages, stating that the "reason for late reporting" was that "[t]he insured was not in agreement with the initial estimate and anticipated full coverage payout on the claim.  We however explained the claims process and they submitted their signed proof of loss."  (Doc. 19-18 at 251-52).  On November 14, 2019, the FIA granted a limited waiver for $83,314.42 in building damages and for $19,976.03 in contents damages as recommended by Hill and the estimate he provided.  (Docs. 19-18 at 252; 20, ¶ 29; 27, ¶ 29).[6]

On November 15, 2019, Defendant sent a letter to Plaintiffs accepting in part and rejecting in part their proof of loss.  (Docs. 27, ¶ 28; 33, ¶ 28).  This November 15, 2019, letter from Defendant was signed by Defendant's adjuster Emmanuel Ayoo.  (Docs. 27, ¶ 28; 33, ¶ 28).  This letter provided, that PIIC was "accepting $103,290.15 of the Proof of Loss and rejecting $139,510.98." (Docs. 20, ¶ 32; 27, ¶ 28; 33, ¶ 28).  The letter further provided that Plaintiffs were owed $83,314.12 of the $150,000 policy limit for covered building damages and $19,976.03 of the $60,000 policy limit for covered contents damages, after subtracting their applicable deductibles ($1,250 for contents and $1,250 for building damages).  (Docs. 20, ¶¶ 31-32; 27, ¶¶ 31-32, 28; 33, ¶ 28).  The November 15, 2019, denial letter did not indicate that Plaintiffs had been late in submitting their proof of loss.  (Docs. 27, ¶ 29; 33, ¶ 29).

On December 9, 2019, Plaintiffs appealed the partial denial of their claim to FEMA.  (Docs. 20, ¶ 33; 27, ¶ 33).  As part of their appeal, Plaintiffs submitted estimates prepared by contractor Jason Seykora, dated November 18, 2019, to repair the cabin and to knock the structure down and rebuild.  (Docs. 27, ¶¶ 34-35; 33, ¶¶ 34-35; 28-1 at 460).  In Mr. Seykora's estimation, it would

---

[6] The waiver provided that:

> Based on the information you submitted, your request for a waiver of the 60 day Proof of Loss policy provision is approved.  This limited waiver is for only the amount of the loss and scope of the damages outlined in this request and otherwise does not waive the proof of loss or any other requirement of the Standard Flood Insurance Policy and makes no other comment because of a lack of information.  If it is later determined that an improper payment was made, the granting of this waiver does not constitute a waiver of the right to seek repayment of any such improperly paid amounts.

(Doc. 19-18 at 252-53).

cost $449,628.75 to remodel the property using the existing frame and whatever structure was potentially salvageable and would cost $361,335 to knock down and build the residence. (Doc. 27, ¶ 35; 33, ¶ 35). On January 5, 2021, after Plaintiffs filed their Complaint in federal court, FEMA issued its decision affirming PIIC's decision to deny coverage for the building and personal property items. (Docs. 27, ¶ 35; 33, ¶ 35; 19-22 at 269).

## B.    Federal Lawsuit

On November 6, 2020, Plaintiffs filed their Complaint in federal district court. (Docs. 1; 20, ¶ 34; 27, ¶ 34). In Count I of the Complaint, Plaintiffs allege a claim for breach of contract for failing to pay the policy limits they allege they were entitled to under the terms of the SFIP. (Doc. 1). Plaintiffs allege in Count II that PIIC's refusal to pay the full amount of their loss was vexatious and without reasonable cause, thus entitling them to attorney's fees under SDCL § 58-12-3 and *Stanton v. State Farm Fire & Cas. Co.,* 78 F.Supp.2d 1029 (D.S.D. 1999). (Doc. 1). In Count III, Plaintiffs allege a claim for negligent misrepresentation in procurement of policy. (Doc. 1). Specifically, Plaintiffs allege that PIIC advised Plaintiffs that at the time they renewed their policy of insurance with Defendant in 2019, that it would provide coverage to the "building" in the amount of $150,000 and coverage to the "contents" in the amount of $60,000. (Doc. 1). Despite making these representations, Plaintiffs allege that PIIC refused to offer the amounts available under the policy for damages directly caused by the flood. (Doc. 1). Plaintiffs allege that PIIC made these representations to Plaintiffs about the amount of insurance as a statement of fact, which was untrue at the time of the representation, with the intent to induce the Plaintiffs to renew their policy of insurance with PIIC. (Doc. 1). In Count IV, Plaintiffs allege a claim for fraudulent misrepresentation in which they allege that in 2019, PIIC made representations to Plaintiffs about the amount of insurance coverage it would make available to Plaintiffs under the insurance policy for damages caused directly by a flood, with the intent to deceive the Plaintiffs and induce them to renew their insurance policy with the Defendant, and that Plaintiffs justifiably relied on the representations of PIIC in renewing their policy and suffered damages as a result. (Doc. 1). In their prayer for relief, Plaintiffs seek: 1) compensatory damages in an amount to be proven at trial; 2) a reasonable sum of attorney's fees pursuant to SDCL § 58-12-3; 3) punitive damages; 4) prejudgment interest, post-judgment interest, and costs of the action; and 5) for such other and further relief as the Court deems just and equitable. (Doc. 1).

PIIC timely reported this litigation to FEMA immediately after it was served with this lawsuit as required by the Arrangement.  (Doc. 20, ¶ 6; 27, ¶ 6).  PIIC's legal bills for the defense of this lawsuit have been submitted periodically to FEMA for reimbursement throughout the course of these proceedings, and FEMA has reimbursed PIIC for each of those bills throughout this case.  (Docs. 20, ¶ 7; 27, ¶ 7).  PIIC has not received any correspondence from the Federal Insurance Administration, FEMA, or its Office of General Counsel declaring or suggesting that this case falls outside the "scope" of the Arrangement as that word is used at Article IV(D)(3) of the Arrangement.  (Docs. 20, ¶ 8; 27, ¶8).

PIIC has moved for partial summary judgment on the following: Plaintiffs' claims for additional buildings damages and some of Plaintiffs' claims for additional contents damages; Plaintiffs' claims for negligent and fraudulent procurement; Plaintiffs' claim for attorneys' fees under SDLC § 58-12-3 and the Equal Access to Justice Act ("EAJA"); Plaintiffs' request for interest and costs.  (Doc. 17).  PIIC has also moved to quash Plaintiffs' jury demand.  (Doc. 21). The motions have been fully briefed by the parties and are ready for disposition.

## DISCUSSION

### I.     Motion for Partial Summary Judgment

As part of the WYO program, FEMA promulgated regulations prescribing the terms of the Standard Flood Insurance Policy ("SFIP") to be used by WYO companies.  *McGair v. Am. Bankers Ins. Co. of Fla.*, 693 F.3d 94, 96 (1st Cir. 2012) (citing 44 C.F.R. pt. 61, app. A(1)).  By regulation, "[t]he Standard Flood Insurance Policy and required endorsements must be used in the Flood Insurance Program, and no provision of the said documents shall be altered, varied, or waived other than by express written consent of the Federal Insurance Administrator."  *Id.* (quoting 44 C.F.R. § 61.13(d)).  When private companies issue WYO policies, they act as "fiscal agents of the United States."  *Id.* (quoting 42 U.S.C. § 4071(a)(1)).

Under the SFIP, the first step that policyholders must take to recover their loss from flood damages is give their insurer "prompt written notice[7]" of the flood loss.  (Doc. 19-2 at 122, SFIP art. VII(J)(1)).  The SFIP also requires that within 60 days after the loss, Plaintiffs send PIIC "a

---

[7]      This initial notice provision is distinct from the requirement that policyholder timely submit a signed and sworn proof of loss.  *Gowland v. Aetna Flood Ins. Program*, 143 F.3d 951, 954 (5th Cir. 1998).

proof of loss, which is [their] statement of the amount [they] are claiming under the policy signed and sworn by [them], and which furnishes [PIIC] with, among other things, "specifications of damaged buildings and detailed repair estimates" and "the inventory of damaged personal property as described in [article VII(J)(3)] above." (Doc. 19-2 at 122, SFIP art. VII(J)(4)(f), (i)). Article VII(J)(3) of Plaintiffs' SFIP provides that in case of flood loss, Plaintiffs must "prepare an inventory of damaged property showing the quantity, description, actual cash value, and amount of loss. Attach all bills receipts, and related documents." (Doc. 19-2 at 122, SFIP art. VII(J)(3)). The SFIP also provides that "[i]n completing the proof of loss, you must use your own judgment concerning the amount of the loss and justify that amount." (Doc. 19-2 at 122, SFIP art. VII(J)(5)).

As a matter of federal law, it is the policyholder's responsibility to submit a timely proof of loss regardless of whether the insurer's adjuster provides the insured with a form. (Doc. 19-2 at 122, SFIP art. VII(J)(7)). While it is common for insurance adjusters to send policyholders proof of loss forms and help them complete it as Colonial Claims did in this case, the policy explicitly warns policyholders that such adjusters furnish those forms as "a matter of courtesy only," and that insureds must still submit a proof of loss within 60 days after the loss even if the adjuster does not furnish the form or help Plaintiffs complete it. *Id.*

Under the SFIP, insurance companies can reject policyholders' proof of loss in favor of their own adjusters' estimate of damages. (Doc. 19-2 at 122, SFIP art. VII(J)(9)). Where there is disagreement about the amount of flood damages or coverage, the SFIP allows policyholders to appeal to FEMA from any denial of their claims or to contest it in federal court. *See* (Doc. 19-2, SFIP art. VII(R)). However, to invoke either procedure for review of the denial of a flood insurance claim, a policyholder must have first filed a timely and compliant proof of loss. *See* 44 C.F.R. § 62.20; 44 C.F.R. pt. 61, app. A(1), art. VII(R).

Because the provisions of Plaintiffs' SFIP are embodied in FEMA's codified regulations, the interpretation of Plaintiffs' SFIP is a matter of federal law. *See McGair*, 693 F.3d at 99; *see also Mccarty v. S. Farm Bureau Cas. Ins. Co.*, 758 F.3d 969, 972 (8th Cir. 2014) (citation omitted) ("It is well settled that federal common law governs the interpretation of the SFIP."). Federal courts have "recognized that the proof of loss requirement is a regulatory limit on the disbursement of funds through a federal insurance program; as such 'it is to be strictly construed [for it] serves as a condition precedent to recovery under the SFIP.'" *Dickson v. Am. Bankers Ins. Co. of Fla.*,

739 F.3d 397, 399 (8th Cir. 2014).  Substantial compliance with the proof of loss requirement is insufficient.  *See Mancini v. Redland Ins. Co.*, 248 F.3d 729, 734 (8th Cir. 2001).  "[P]recise adherence to the SFIP's requirements is necessary as a constitutional matter to prevent the judiciary from drifting beyond Article III.  Only Congress can appropriate funds from the U.S. Treasury, and any judicial decision ordering disbursement of federal funds on terms not authorized by Congress would breach constitutional barriers." *McCarty*, 758 F.3d at 973 (citing *Mancini*, 248 F.3d at 735).  "In fact, '[t]he SFIP's procedural requirements' have jurisdictional implications because these requirements 'constitute conditions precedent to a waiver by the federal government of its sovereign immunity.'" *Id.* (quoting *Wagner v. Dir., FEMA*, 847 F.2d 515, 518 (9th Cir. 1988)).  "'Not even the temptations of a hard case' will provide a basis for ordering recovery contrary to the terms of [a] regulation." *Forman v. Fed. Emergency Mgmt. Agency*, 138 F.3d 543, 545 (5th Cir. 2005) (quoting *OPM v. Richmond*, 496 U.S. 414, 420 (1990)).

### A. Breach of Contract Claim for Building Damages

PIIC has moved for summary judgment on Plaintiffs' breach of contract claim for building damages. (Doc. 20 at 335).  PIIC argues that Plaintiffs failed to submit within sixty (60) days after the loss, "specifications of damaged buildings and detailed repair estimates" as required by Article VII(J)(4)(f) of the SFIP. (Doc. 20 at 335).  PIIC argues that because Plaintiffs failed to comply with all conditions precedent prior to filing this lawsuit as required by Article VII(R) of the SFIP, Plaintiffs' claims for additional building damages fail as a matter of law. (Doc. 20 at 338).

PIIC asserts that the 60-day deadline to provide a complete and compliant proof of loss was on November 10, 2019. (Doc. 20, ¶ 25). PIIC acknowledges that Plaintiffs provided Mr. Hill a proof of loss form for $242,801.13 on November 8, 2019. (Doc. 20, ¶ 24).  PIIC also acknowledges that Plaintiffs emailed Mr. Hill a supplement to their proof of loss form on November 10, 2019—within the 60-day deadline. (Doc. 27, ¶ 23; 33, ¶ 23).  The Court will therefore review Plaintiffs' proof of loss form, their supplement thereto, along with their contents itemization, photographs, and email searches for contents damaged by the flood, (Doc. 20, ¶ 26), in determining whether Plaintiffs have complied with the requirements of the SFIP.

The Eighth Circuit Court of Appeals has held that an insured under a SFIP must "show actual and complete compliance" with the requirements of the SFIP and that "it is not sufficient to show . . . substantial[ ] compli[ance] or that the insurer suffered no prejudice." *Mancini v. Redland*

*Ins. Co.*, 248 F.3d 729, 734 (8th Cir. 2001). The Eighth Circuit Court of Appeals has analyzed the "actual and complete compliance" requirement in the following cases: *Mancini v. Redland Ins. Co.*, 248 F.3d 729 (8th Cir. 2001), *Gunter v. Farmers Ins. Co.*, 736 F.3d 768 (8th Cir. 2013), and *McCarty v. S. Farm Bureau Cas. Inc. Co.*, 758 F.3d 969 (8th Cir. 2014). In *Mancini*, the independent adjuster sent the insured a proof of loss form containing all the required information, together with an adjuster's report and supporting documentation estimating the value of their loss at $56,000. *Id.* at 732. The adjuster indicated that the proof of loss must be signed and notarized. *Id.* The insureds believed they were entitled to the full policy limit of $93,000. *Id.* Instead of signing the forms and returning them to the adjuster, the insured faxed them, neither signed nor notarized, to the adjuster's claims representative with a hand-printed cover sheet bearing their printed names and providing that "here is the information you are waiting on from [the adjuster]." *Id.* at 732-33. The district court held that the insureds had "technically complied with the proof of loss provisions of the policy" and awarded the insured the approximately $56,000 included by the adjuster on the proof of loss form, but denied other items of damages as not having been submitted to the company in accordance with the policy. *Id.* at 733.

The Eighth Circuit Court of Appeals in *Mancini* reversed. *Id.* at 735. The court stated that even if it was to accept the printed names of the insured on the cover sheet as the insured's signature, the insured still failed to comply with the SFIP's requirements because it "does not appear on a statement by the [insureds] as to the amount they claimed under the policy." *Id.* at 734. Instead, the handwritten note stated only that the accompanying fax contained "the information . . . from [the adjuster]"; "[i]t ma[de] no representation that the [insureds] believed [the adjuster's] figures were correct, or that they wished to use them as a basis for their claim." *Id.* The court noted that, in fact, the adjuster testified that his reason for not signing the form was that "$56,000 was not agreeable." *Id.* Because the insured failed to submit a signed and sworn statement as to the amount claimed under the policy, the Court concluded that he failed to strictly comply with the requirements of the SFIP and held that the insured was divested of the right to sue for damages in federal court. *Id.* at 735.

In *Gunter*, the insureds held a SFIP through a WYO carrier, Farmers Insurance Company, and filed claims under their policy, stating that the flood had produced cracks along the interior and exterior walls of their home. 736 F.3d at 770. Farmers sent an engineer to inspect the property

15

who concluded that most of the damage to the home was unrelated to the flood. *Id.* The insured submitted to Farmers a proof of loss claiming $12,488.04 and a building replacement proof of loss claiming $249.73. *Id.* Farmers reviewed the proof of loss in light of the engineer's report and paid $12,237.77 of the insured's stated loss. *Id.* The insured's home was subsequently condemned and the insured's asked Farmers to inspect the property again and the engineer concluded that approximately 30% of the building was damaged by settlement during and after the flood. *Id.* at 771. The insureds sought additional recovery under their Farmers flood policy in federal court. *Id.* The district court granted summary judgment to Farmers after concluding that the insured had failed to submit a proof of loss for any recovery above the amount the company had already paid as required under the SFIP. *Id.*

On appeal, the insureds in *Gunter* argued that *Mancini* did not apply because unlike the appellants in that case, the insureds timely filed a valid proof of loss for the amount of their undisputed damage, thereby fulfilling the prerequisites for suing on the disputed amount of loss on the same residence. *Id.* at 773-74. The Eighth Circuit Court of Appeals found the First Circuit's analysis of a similar argument in *DeCosta v. Allstate Insurance Company*, 730 F.3d 76 (1st Cir. 2013) persuasive and rejected the insureds' argument. *Id.* at 774. In *DeCosta*, the court concluded that a signed and sworn proof of loss for building damages "claims only the amounts listed in those forms," and that the insured must timely file an additional proof of loss to claim any additional amount of money. *Id.* (citing *DeCosta*, 730 F.3d at 85). The court in *Gunter* concluded that "[t]he proof of loss requirement as strictly construed makes clear that the [insureds] did not timely file one for the amount they now claim in litigation." *Id.*; *see also Dickson v. Am. Bankers Ins. Co. of Fla.*, 739 F.3d 397, 399 (8th Cir. 2014) (citing *Gunter*, 736 F.3d at 774).

In *McCarty*, the insured had purchased from Southern Farm Bureau Casualty Insurance Co. a standard flood insurance policy shortly before the Mississippi River flooded his riverside hunting cabin. 758 F.3d at 971. Farm Bureau assigned adjuster to process his claim. *Id.* Although in some cases, the SFIP allows an insurer to "accept the adjuster's report of the loss instead of [the insured's] proof of loss," the insured "must sign the adjuster's report" and the insured in *McCarty* never did so. *Id.* The insured also never signed a proof of loss at any time nor did he sign any document listing the necessary information, including loss amounts, required by the proof of loss form. *Id.* The Eighth Circuit Court of Appeals held that the insured was precluded from recovery

for flood damage under his SFIP because he failed to comply with the SFIP's required that he submit a timely proof of loss. *Id.* at 973.

The Court finds that unlike in *Mancini* and *McCarty* cases, Plaintiffs complied with the SFIP's requirements to timely submit a signed and sworn proof of loss as to the amount claimed under their policy and unlike in *Gunter*, Plaintiffs are not seeking damages in excess of the amount claimed on their proof of loss. PIIC contends, however, that Plaintiffs' proof of loss and supplement thereto do not fulfill the SFIP's requirement requiring the insured to submit "specifications of damaged buildings and detailed repair estimates."

The SFIP does not define "specifications of damaged buildings and detailed repair estimates" and the Eighth Circuit Court of Appeals have not set forth any criteria for what documentation may satisfy this requirement. Other jurisdictions that have examined the issue, as Plaintiffs pointed out, have held that "an insured must submit enough support to allow the insurer to evaluate the merits of the claim including the estimated cost of repair." (Doc. 26 at 431) (citing *Sun Ray Vill. Owners Ass'n v. Old Dominion Ins.*, 546 F.Supp.2d 1283, 1291 (N.D. Fla. 2008)). In *Sun Ray Village Owners Association v. Old Dominion Insurance*, which Plaintiffs cited in opposition to PIIC's motion for summary judgment, the court stated that "[t]he language of the SFIP indicates, however, that at a minimum insureds must identify the components of the insured building which have been damaged ("specifications of damaged buildings") and then estimate the cost of repairing each damaged components ("detailed repair estimates")." *Id.* "These estimates may consist of contractors' estimates or the insured's own valuation of the cost of repair based on his or her personal knowledge or research," but must "provide some means by which the insurer can verify the amount claimed." *Id.* at 1292, n19. The court acknowledged, however, that "[t]he amount and character of the supporting documentation required will depend on the facts of each individual case." *Sun Ray Village*, 546 F.Supp.2d at 1292, n19.

The Court concludes that under the facts of this case, Plaintiffs' proof of loss and supplement thereto provided enough support to allow the insurer to evaluate the merits of Plaintiffs' building damages claim. Plaintiffs made clear in their proof of loss supplement that "[d]ating back to the initial meeting with the onsite adjuster it was made clear to [them] that everything in [Plaintiffs'] cabin would be a total loss," and that their "cabin would need to be knocked down and all the contents dumped" because significant mold was already present and

there was no way to get contractors in to mitigate damages because the cabin was surrounded by water on all sides for approximately 3 weeks. (Doc. 19-16). Because Plaintiffs' cabin was not their primary residence, their SFIP provides that they are entitled to the "actual cash value" of the structure. (Doc. 19-2, SFIP art. VII(V)(4)(i)). Plaintiffs' SFIP defines "actual cash value" as "the cost to replace an insured item of property at the time of loss, less the value of its physical depreciation." (Doc. 19-2, SFIP art. II(B)(2)). Plaintiffs indicated in the supplement to their proof of loss that based on their conversation with engineer Erik Moore, they estimated the cost to replace their cabin "by stripping the structure down to the studs (assuming you would use the moldy studs), raising the structure over 4 feet, and refinishing would cost at least $200,000." (Doc. 19-16). Plaintiffs also indicated in their proof of loss form estimated depreciation to be deducted from their claim. (Doc. 19-16). Under the SFIP, PIIC was not required to accept Plaintiffs' proof of loss and may accept at its discretion, the adjuster's report of the loss. (Doc. 19-2, SFIP art VII(J)(9)). However, the Court concludes that under the facts of this case, Plaintiffs have complied with the SFIP's requirement to timely submit a signed and sworn proof of loss and that the supplement to their proof of loss adequately detailed the basis of their claim that their cabin was a total loss.

## B. Breach of Contact for Contents Damages

### 1. Background

Independent adjuster, Mr. Hill, asked Plaintiffs to prepare a list of contents and values for all of the personal property contents destroyed by the flood. (Docs. 27, ¶ 13; 33, ¶ 13). Plaintiffs compiled a list documenting their personal property that was damaged by the flood and the estimated value and sent it to Mr. Hill in an email on September 29, 2019. (Docs. 27, ¶ 13; 33, ¶ 13; 19-11 at 161). Mr. Hill acknowledged receipt of Plaintiffs' email and asked for photos of some of the items listed by them as well as additional price verification listing the company name, brand, model, etc. so he could verify the pricing. (Docs. 27, ¶ 14; 33, ¶ 14; 19-11 at 166). With regard to categories of goods listed such as "pots and pans" and "tools," Mr. Hill requested that Plaintiffs provide more details of the items and more photos. (Docs. 27, ¶ 15; 33, ¶ 15; 19-11 at 169). On October 7, 2019, Mr. Reilly responded to Mr. Hill with prices from an internet search and photographs of many of the products and items Mr. Hills had requested. (Doc. 27, ¶ 15; 33, ¶ 15).

On November 4, 2019, Mr. Hill sent Plaintiffs an email stating that the price verification list that Plaintiffs sent on October 7, 2019, was insufficient. (Doc. 19-11 at 190). Mr. Hill asked Mr. Reilly if he had original invoices for any of the higher priced items and asked whether it was possible to go back to where the items were purchased and see if they could print out an invoice. (Doc. 19-11 at 190). Mr. Hill also asked whether it was possible to get a photo of the tags on the sectional, love seat, and beds so that he could verify the brand of these items. (Doc. 19-11 at 190). Mr. Hill stated that Plaintiffs had several options with regard to their claim for contents damages. (Doc. 19-11 at 190). Mr. Hill stated that if Plaintiffs could fully verify the brand, cost with actual invoice or tag verification, he could add these costs to the contents estimate. (Doc. 19-11 at 190). If Plaintiffs were unable to do so, Mr. Hill stated that he could apply like kind and quality pricing for the items from FEMA's database or once Plaintiffs completed their proof of loss form, he could include all items that Plaintiffs are unable to verify in a denial request directly to the carrier and then Plaintiffs could appeal to the carrier. (Doc. 19-11 at 190, 192). Mr. Hill concluded the letter by requesting that Mr. Reilly review the contents spreadsheet again and provide him with further verification so that Mr. Hill could add these contents to the claim. (Doc. 19-11 at 190-91).

On November 7, 2019, Mr. Hill sent Mr. Reilly an email with an updated estimate for Mr. Reilly's review. (Doc. 19-11 at 192). Mr. Hill indicated in the email that the estimate included all remaining contents items that Mr. Reilly had requested payment on, but that he applied database pricing for some of the items because there was no documentation that Mr. Hill could use to verify the prices of some of the contents. (Doc. 19-11 at 192). Hill also included several items in a denial request. (Doc. 19-11 at 192). Hill's final estimate for building damages totaled $95,814.47 Replacement Cost Value ("RCV"). (Doc. 20, ¶ 20; 27, ¶ 20). After deducting the non-recoverable depreciation of $11,250.35 and the $1,250 deductible, the net total building claim was $83,314.12. (Doc. 20, ¶ 20; 27, ¶ 20). Hill's final estimate for contents damages totaled $28,648.89 RCV. (Doc. 20, ¶ 21; 27, ¶21). After deducting the non-recoverable depreciation of $7,422.86 and the $1,250, the net total contents claim was $19,976.03. (Doc. 20, ¶ 21, 27, ¶ 21).

Defendants have moved for summary judgment on Plaintiffs' claims for additional contents damages relating the following items: dishware, utensils, ATV helmet, 25 life jackets, blue tooth speaker, 3 hoses, hose carrier, 6 lawn chairs, 4 beach chairs, 4 towable tubes, water ski trainer, custom bean bag boards and bags, toys, rakes, shovel, broom, 2 garbage cans, sump pump, 3

fishing poles, tackle box, cordless battery charger, electric battery charger, air compressor, ratchet straps, tarp, wet suit, jumper cables, Honda lawn mover bag, tether ball set, croquet set, grill cover, miscellaneous lawn care tools, ski and tow ropes, socket set, weed wacker, industrial extension cords, propane tank, jet ski cover, 2 kids scooters, hand saws, drill, Honda lawn mower bag, dock bumpers, and dock wheels. (Doc. 20 at 340). Defendant argues that Plaintiffs have failed to submit any evidence to prove that the items were located in the cabin and/or shed and were damaged by the flood to warrant payment of the same. (Doc. 20 at 339-40).

Defendant has also moved for summary judgment on Plaintiffs' claims for "pots and pans," "misc. supplies," "tools", "multiple sizes of shoes and water shoes," "clothes-adult female," "clothes-adult male," because Plaintiffs failed to describe these items sufficiently to allow Defendant to identify and verify the items that sustained flood damage. (Doc. 20 at 340).

Defendant has moved for summary judgment on Plaintiffs' claim for blinds and ceiling fans because they are not payable under Coverage B (contents), but fall under Coverage A (building) and are thus not covered contents items. (Doc. 20 at 341).

### 2. Analysis

Article VII(J) of the SFIP provides that in case of a flood loss to insured property, Plaintiffs must, among, other things: 1. Give prompt written notice to Defendant;  2. As soon as reasonably possible, separate the damaged and undamaged property, putting it in the best possible order so that Defendant may examine it; 3. Prepare an inventory of damaged property showing the quantity, description, actual cash value, and amount of loss.  Attach all bills, receipts and related documents. Article VII(J)(4)(f) of the SFIP provides that within 60 days after a loss, Plaintiffs must provide their Proof of Loss which is Plaintiffs' statement of the amount they are claiming under the policy signed and sworn by them, and which furnishes Defendant with an inventory of damaged personal property described in Article VII(J)(3) of the SFIP.  Article VII(J)(3) of the SFIP requires that a claimant "Prepare and inventory of damaged property showing the quantity, description, actual cash value, and amount of loss.  Attach all bills, receipts, and related documents."

Plaintiffs argue in opposition to Defendant's motion for partial summary judgment that Defendant did not previously request additional supporting evidence for many of the items identified in its brief until now and that nevertheless, Plaintiffs submitted evidence supporting the

vast majority of contents items on which Defendant has moved for summary judgment. (Doc. 26 at 434). Plaintiffs contend that a series of photographs taken between September 25, 2019, and October 5, 2019, which accompany the Affidavit of Brendan Reilly at Exhibit E, contain examples of many of the items damaged by the flood that Defendant now identifies as lacking support. The items in these photographs include, but are not limited to, kid-sized scooters, a jet ski cover, a propane tank, industrial extension cords, a weed whacker, a socket set, ski and tow ropes, lawn care tools, a grill cover, a tetherball set, a Honda lawnmower bag, a wet suit, a tarp, ratchet straps, an air compressor, a shovel, toys, a custom bean bag board with bags, a water ski trainer, 4 towable tubes, 4 beach chairs, 6 lawn chairs, and life jackets. (Doc. 26 at 434). Finally, with regard to Defendant's motion for partial summary judgment on Plaintiffs' claims for general categories of goods such as "pots and pans" and "tools," Plaintiff argues that the SFIP does not require them to "itemize and separately assign a value to every spring, every screwdriver, every sock, and every plate that was lost or damaged in the flood." Plaintiff further notes that Defendant accepted Plaintiffs' use of similar descriptive categories for other items such as "games," "glasses," "silverware," "paint supplies," and "toiletries." (Doc. 26 at 435). Plaintiffs do not appear to contest Defendant's argument that their claim for damages to "blinds" and "ceiling fans" are covered under their structural loss claim as opposed to their contents claim. (Doc. 26 at 436) (noting that the estimated value of these items is less than $1,200 and that Plaintiffs' damages for their structure and contents claims each exceed their policy's respective limits and that "it makes no difference whether the Court considers these items as part of Plaintiffs' contents claim or as part of their structural loss claim.").

The Court finds that questions of fact exist as to whether Plaintiffs' proof of loss and corresponding documents comply with Article VII(J)(3)-(4) as to Plaintiffs' claim for damages to personal property. As Plaintiffs have noted, Defendant does not contest that it was unable to evaluate the merits of some of Plaintiffs' other claims for contents damages for such things as "glasses" and "silverware." In addition, a jury may conclude that the photographs and internet printouts with corresponding prices provided to Mr. Hill complied with the SFIP's requirements as to all or some of the contents. Because a reasonable jury could find Plaintiffs' proof of loss and supporting documentation as to their claim for contents damages is sufficient to evaluate the merits of Plaintiffs' content damages claim, summary judgment is denied as to these claims.

## C. Plaintiffs' Extra-Contractual Claims

Plaintiffs' Complaint alleges extra-contractual claims in this matter, which include (1) attorney fees pursuant to SDCL § 58-12-3 on the basis that Defendant's refusal to pay the full amount of Plaintiffs' loss was vexatious and without reasonable cause (Count II); and (2) claims for negligent and fraudulent misrepresentation in procurement of policy (Counts III and IV).

### 1. Negligent and Fraudulent Procurement Claims

The parties agree that the Eighth Circuit has held that state law tort claims against a WYO carrier that arise out of claims handling matters are preempted and barred by federal law. (Docs. 32 at 573; 26 at 437) (citing *Gunter v. Farmers Ins. Co.*, 736 F.3d 768, 772 (8th Cir. 2013) ("We conclude that Article IX as amended demonstrates the clear intent to preempt state law claims that arise from the handling of a claim under the SFIP."). Although the Eighth Circuit has not directly addressed the issue, the parties in this case agree that claims for negligent and fraudulent procurement of a flood policy are frequently not considered by courts to be preempted under federal law. (Docs. 26 at 437; 32 at 573). Both parties cite to the decision by the Fifth Circuit Court of Appeals in *Campo v. Allstate*, 562 F.3d 751 (5th Cir. 2009) for this proposition. The issue before the Court, then, is whether Plaintiffs' claims are in fact related to claims handling or claims procurement.

Plaintiffs argue that their claims are for negligent and fraudulent misrepresentation in procurement of policy and are not preempted by federal law. In Plaintiffs' claims for negligent and fraudulent misrepresentation in Counts III and IV, Plaintiffs allege that in 2019, prior to the flood event, Defendant mailed to Plaintiffs a renewal form and bill for Plaintiffs to renew their policy of flood insurance with Defendant. (Docs. 1, ¶ 30; 30-1 at 489). Plaintiffs allege that at the time they renewed their policy of insurance with Defendant in 2019, Defendant made representations in the renewal form to Plaintiffs about the amount of insurance coverage it would make available to Plaintiffs ($150,000 for building coverage and $60,000 for contents coverage). (Doc. 1, ¶¶ 42, 48). Plaintiffs further allege that Defendant either knew the representations were untrue at the time they were made, or made them recklessly without a reasonable ground for believing them to be true—all with the intent to induce Plaintiffs to renew their policy, and that Plaintiffs were damaged thereby.

At no time from the date the initial policy was in effect on June 30, 2011 until the date of the flood on September 11, 2019, did Plaintiffs have any verbal conversations with anyone at Philadelphia Indemnity Insurance Company. (Doc. 34-7; Tiffany Reilly Dep. 11:5-19). The basis of Plaintiffs' negligent and fraudulent misrepresentation claims is the annual renewal notice mailed to Plaintiffs to renew their policy for the policy period June 30, 2019 until June 30, 2020 for $150,000 in building coverage and $60,000 in contents coverage.

Plaintiffs rely on *Campo v. Allstate*, 562 F.3d 751 (5th Cir. 2009) for the proposition that their alleged "procurement" claims are not preempted. (Doc. 26 at 437). In *Campo*, the plaintiff filed a claim under his expired flood policy which was issued by Allstate Insurance Company, a WYO carrier, shortly after his home had been destroyed by Hurricane Katrina. *Id.* at 752-53. Allstate sent the plaintiff a letter indicating that it had evaluated his claim and requested the NFIP to issue a check payable to the plaintiff for the policy limit of $98,200 and sent the plaintiff an advance check of $2,500 for additional living expenses. *Id.* at 753. Allstate did not inform the plaintiff that these payments were conditional on Allstate's eventual timely receipt of the $1,237 renewal premium. *Id.* The extended grace period expired without Campo having submitted the premium. *Id.* Allstate sent the plaintiff a letter stating that coverage could not be extended for this claim and instructing the plaintiff to repay the $2,500 it had advanced because the plaintiff's coverage had lapsed. *Id.* The plaintiff filed a lawsuit alleging that Allstate made negligent misrepresentations that prevented him from renewing his policy. *Id.*

Reviewing the plaintiff's claim on appeal, the Fifth Circuit Court of Appeals in *Campo* acknowledged that federal law preempted state law tort claims arising from claims handling by a WYO. *Id.* at 754. In examining the facts of the case, however, the court concluded that the plaintiff's claim was related to procurement rather than handling. *Id.* at 755. The court reasoned:

> At the relevant time, Campo's policy had expired subject to restoration only in the event that he paid the premium within the extended grace period. Allstate was thus by definition incapable of *handling* any new claims based on post-expiration occurrences... Campo's coverage had *expired*; there was thus nothing to continue. Instead, as a former policyholder, Campo would have had to *procure* flood insurance. One way for him to do this was to pay his renewal premium to Allstate by December 12, which would have caused his expired policy to be *reinstated*.
>
> . . .

23

Even though this is not a matter of *initial* procurement, the discrete facts of this case nevertheless demonstrate that it is procurement-related: Allstate's alleged misrepresentations occurred when Campo's only relationship with Allstate was that of a both a *former* and a *potential future* policyholder. Further, Allstate's representations were allegedly of a kind that could lull parties like Campo into believing that they would receive indemnity without having to submit any additional payment . . . while the shot clock of the grace period ticked away.

*Id.* at 756. The court in *Campo* held that "[i]n light of the peculiar and unusual circumstances of this case, we hold that Campo's state-law claims are not related to the handling of an insurance claim, but rather concern a species of insurance procurement." *Id.* The court further held that federal law did not preempt procurement-related claims. *Id.* at 757-58.

Subsequent to *Campo*, the Fifth Circuit Court of Appeals issued its decision in *Grissom v. Liberty Mutual Fire Ins. Co.*, 678 F.3d 397 (5th Cir. 2012). In *Grissom*, after the plaintiff's claim for coverage was granted and paid in full, the plaintiff discovered his eligibility for additional subsidized coverage. *Id.* at 401. Only then did the plaintiff raise the negligent misrepresentation claim against his WYO insurer to obtain additional payments. *Id.* The basis of the plaintiff's negligent misrepresentation claim was that while he was already insured, his insurer should have been more proactive in informing him of his eligibility for additional subsidized flood insurance coverage. *Id.* The defendant WYO insurer moved for summary judgment on the plaintiff's negligent misrepresentation claim, arguing that it was a state law tort claim arising from claims handling by a WYO and was thus preempted by federal law. *Id.* at 400. The plaintiff had argued in opposition that there was no preemption because the WYO insurer's negligence occurred while seeking to renew the plaintiff's policy rather than in the course of some other policy administration task. *Id.* In analyzing whether the plaintiff's claim was claim handling or insurance procurement, the court stated that:

The key factor to determine if an interaction with an insurer is "claims handling" is the status of the insured at the time of the interaction between the parties. If the individual is already covered and in the midst of a non-lapsed insurance policy, the interactions between the insurer and insured, including renewals of insurance, are "claims handling" subject to preemption.

*Id.* at 401; *c.f.*, *Harris v. Nationwide Mut. Fire Ins. Co.*, 832 F.3d 593, 597 (6th Cir. 2016) ("Because plaintiffs were potential future policyholders at the time the alleged wrongs occurred, to the extent that their state-law claims arise solely from the policy-procurement process, the NFIA

does not preempt them."); *M & K Rest. LLC v. Farmers Ins. Co.*, 29 F.Supp.3d 1204, 1230 (E.D. Ark. 2014) ("[F]acts may come to light which reveal that the [plaintiffs] were in fact covered by the SFIP starting May 2, 2011. If so, some of the [plaintiffs'] state law-based claims against [the insurer] may in fact be claims-handling claims, and thus, expressly preempted by federal law."). The *Grissom* court stated that in *Campo*, it was the lapse in coverage that turned what would otherwise be a renewal into the procurement of a new policy. *Id.* at 401. The court distinguished *Campo*, stating that "[b]ecause [the plaintiff's] dispute with [the WYO insurer] relate[d] to his renewal of a policy already in place," it was "claims handling, not the initial procurement of the insurance policy" and held that "*Campo* does not control. . . and [the plaintiff's] state law claim is preempted." *Id.*

Even if the Eighth Circuit Court of Appeals were to conclude, as the Fifth Circuit did in *Campo*, that state law tort claims relating to the procurement of flood insurance under the NFIP were not preempted by federal law, the Court finds that under the facts of this case, and the *Grissom* decision issued after *Campo*, Plaintiffs' claims are not procurement-related claims, but rather are claims-handling related claims. Unlike in *Campo*, there is no evidence that there was ever a "lapse in coverage [to] turn[] what would otherwise be a renewal into the procurement of a new policy." *See Grissom*, 678 F.3d at 401 (discussing the *Campo* case). Plaintiffs' initial policy period was from June 30, 2011 until June 30, 2012. Renewal notices were mailed before the policy expired on June 30th each year and Plaintiffs renewed their policy annually, without lapse, until June 30, 2020. As in *Grissom*, the alleged misrepresentations in this case concern a renewal of a policy that was already in place.

The Court notes further that Plaintiffs have failed to point to any evidence in the summary judgment record to support its contention that at the time Defendant offered to renew Plaintiffs' insurance policy, it did not have a reasonable ground for believing that it would make $150,000 in building coverage and $60,000 in contents coverage available to Plaintiffs and that this renewal offer was made with the intent to induce Plaintiffs to renew their insurance policy with Defendant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (providing that summary judgment is warranted if the nonmoving party has failed to present evidence to support an element of the nonmovant's case on which it bears the ultimate burden of proof). No reasonable juror could conclude that Defendant did not have a reasonable ground for believing that it would make

$150,000 in building coverage and $60,000 in contents coverage available to Plaintiffs at the time it mailed Plaintiffs their renewal notice simply because when Plaintiffs filed a flood claim several months later, Defendant ultimately paid less than the policy limits. Plaintiffs' SFIP specifically provides that PIIC had the discretion to "accept the adjuster's report of the loss instead of [Plaintiffs'] proof of loss" and Mr. Hill's report was the only detailed repair estimate that had been provided to PIIC for consideration by the proof of loss deadline. For these reasons, the Court concludes that Plaintiffs' state law claims for negligent and fraudulent procurement are preempted by federal law.

### 2. Attorneys' Fees Claims

In Count I of the Complaint, Plaintiffs allege that Defendant breach the SFIP by failing to pay Plaintiffs the policy limits for building and contents damages under their SFIP. In Count II, Plaintiffs allege that Defendant's refusal to pay the policy limits was vexatious and without reasonable cause entitling Plaintiffs to attorney's fees pursuant to SDCL § 58-12-3. Defendant has moved for summary judgment on Plaintiffs' claim for attorney's fees, arguing that such claim is preempted by federal law.

In support of their argument that attorney's fees under SDCL § 58-12-3 are not preempted by the NFIA, Plaintiffs point to *Stanton v. State Farm Fire & Cas. Co.*, 78 F.Supp.2d 1029 (D.S.D. 1999) (Kornmann, J.). In *Stanton*, the plaintiffs suffered damage to their building as a result of substantial flooding. *Id.* at 1029. The plaintiffs' WYO insurer offered to settle Plaintiffs' claims for an amount determined by an independent adjuster—an offer that the plaintiffs rejected. *Id.* at 1029-30. The plaintiffs filed a lawsuit alleging that the WYO insurer breached its duty of good faith and fair dealing and intentionally inflicted emotional distress upon the plaintiffs. *Id.* at 1030. The WYO insurer defendant moved to dismiss the plaintiffs' claims on the basis that the plaintiffs' state law tort claims were preempted by the NFIA. *Id.*

The court concluded that the NFIA did not expressly preempt state law tort claims. *Id.* at 1033. In addressing the defendant's field preemption claim, the court reviewed the regulations issued under the NFIA and concluded that "'FEMA regulations disclaiming any agency relationship with WYO companies, as well as the terms of the FEMA-WYO agreement, more indicate intent to leave those insurers responsible for their own tortious conduct' than they indicate an intent to insulate those insurers from the tortious conduct of their agents." *Id.* at 1037 (citing

*Spence v. Omaha Indem.*, 996 F.2d 793, 797 (5th Cir. 1993)). The court stated that "[s]ince there is no provision in the NFIA for holding insurers liable for errors or omissions, the most logical conclusion to be drawn from [these] statutory provision[s] is that Congress contemplated that state tort law could apply to the conduct of insurers." *Id.* (quoting *Cohen v. State Farm*, 68 F.Supp.2d 1151, 1156-57 (C.D. Cal. 1999)). Accordingly, the court in *Stanton* concluded that the regulations themselves dispel any conclusion that field preemption was intended. *See id.* at 1038. The court acknowledged that attorney's fees under SDCL § 58-12-3 were not recoverable in tort claims, but permitted plaintiff's statutory attorney's fees claim to move beyond the motion to dismiss, stating that such claim might be "viable" because there was "apparently no possibility that FEMA could be held liable for attorney fees." *Id.* at 1030.

In 2000,[8] subsequent to the *Stanton* decision, the SFIP was amended to contain a provision that reads:

> This policy and *all disputes arising from the handling of any claim* under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, et seq.), and Federal common law.

44 C.F.R. Pt. 61, App. A(1), Article IX (emphasis added); 65 FR 60758-01 (Oct. 12, 2000); 65 FR 34823 (May 31, 2000); *Shuford v. Fidelity Nat. Property & Cas. Ins. Co.*, 508 F.3d 1337, 1344 (11th Cir. 2007) (stating that the provision became effective on December 31, 2000). Article IX was included to "ensure uniform interpretation of SFIP and to clarify that 'matters pertaining to the [SFIP], including issues relating to and arising out of claims handling, must be heard in Federal court and are governed exclusively by Federal law.'" *Gunter v. Farmers Ins. Co.*, 736 F.3d 768, 772 (8th Cir. 2013) (quoting 65 Fed.Reg. 34,824, 34,826-27 (May 31, 2000)). In *Gunter v.*

---

[8]    Defendant stated in its brief that the SFIP was revised in October 2021 to include Article X which reads, "This policy and all disputes arising from the insurer's policy issuance, policy administration, or the handling or any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA, the National Flood Insurance Act of 1968, as amended (42 U.S.C. § 4001, *et seq.*), and Federal common law." (Doc. 20 at 344). Plaintiffs contend that Article X does not apply to this case because it did not take effect until after Plaintiffs filed suit.

The SFIP was most recently amended in October 2021, as Defendant states. However, the SFIP was previously amended on December 30, 2000 to include this same language in Article IX of the SFIP and was in effect when Plaintiffs were issued their policy in June 2011 and when it last renewed in June 2019. *See Gunter*, 736 F.3d at 722 (quoting 65 Fed.Reg. 34,824, 34,826-27 (May 31, 2000)); 65 FR 60758-01 (Oct. 12, 2000); *Shuford v. Fidelity Nat. Property & Cas. Ins. Co.*, 508 F.3d 1337, 1344 (11th Cir. 2007) (stating that the provision became effective on December 31, 2000); *Wright v. Allstate Ins. Co.*, 415 F.3d 384 (5th Cir. 2005) (same).

*Farmers Ins. Co.*, the District Court for the Eastern District of Arkansas granted the WYO carrier's motion to dismiss the plaintiff's extra-contractual state law claims. Civ. No. 4:11-0161, 2012 WL 12895684, at *4 (E.D. Ark. Jul. 11, 2012). The court acknowledged the *Stanton* ruling that the NFIA did not expressly preempt state law tort claims, but stated that *Stanton* was decided before the 2000 amendment that added the express preemption provision and opined that the court "might well have come to a different conclusion as to express preemption if the SFIP at issue there contained the amended article nine." *Id.* at *3. On appeal, the Eighth Circuit Court of Appeals affirmed, holding that "Article IX as amended demonstrates the clear intent to preempt state law claims that arising from the handling of a claim under the SFIP." *Gunter,* 736 F.3d at 772.

It is clear to the Court that under Article IX of the SFIP that was in effect at the time Plaintiffs' renewed their policy in June 2019, and the Eighth Circuit's interpretation of Article IX in *Gunter*, state law claims arising from the handling of the claim under the SFIP are expressly preempted by the NFIA. As discussed above in this opinion, the parties do not dispute this issue. (Docs. 32 at 573; 26 at 437) (citing *Gunter*, 736 F.3d at 772). However, Plaintiffs appear to argue that even so, attorney's fees are not preempted and are thus recoverable under SDLC § 58-12-3 if Defendant's refusal to settle within policy limits during their handling of the claim was vexatious and without reasonable cause. The Court disagrees.

The parties acknowledge that the reason extra-contractual tort claims relating to the procurement of an insurance policy under the NFIP are not always preempted by federal law is because such claims are generally not payable from the federal treasury. (Doc. 26 at 437) (quoting *Landry v. State Farm Fire & Cas. Co.*, 428 F.Supp.2d 531, 534 (E.D. La. 2006)); (Doc. 26 at 439) (quoting *Shapiro v. Wright Nat'l Flood Ins. Co.*, Civ. No. 2:19-0679, 2020 WL 224538, at *4 (M.D. Fla. Jan. 15, 2020) ("[T]he determining factor is whether the government is the source of the funds or who would pay an award of attorney's fees and costs.")). In *Landry v. State Farm Fire & Cas. Co.*, which was cited by Plaintiffs in their brief opposing summary judgment, the court explained that:

> Policies under the National Flood Insurance Program are paid from the federal treasury; thus, claims regarding handling of those policies also involve the spending of federal funds. However, under the NFIA, federal funds are not used to reimburse WYO insurers for liability arising outside the scope of the Act. Thus, for tort claims or extra-contractual claims related to an NFIA policy, an insured can obtain no reimbursement from the federal treasury because these claims fall outside the scope

of the Act.  Therefore, there is no equivalent justification for federal jurisdiction for state law tort claims because there is no expenditure of federal funds.

428 F.Supp.2d 531, 534.

Unlike extra-contractual tort claims relating to procurement of the policy, claims for attorney's fees under SDCL § 58-12-3 in this case would be paid from the federal treasury.  The NFIA provides that the federal government will both indemnify and defend WYO insurers in the program for insurance and litigation expenses unless the "litigation is grounded in actions by the [WYO] Company that are significantly outside the scope of th[e] Arrangement, and/or involves issues of agent negligence." *Grissom v. Liberty Mut. Fire Ins. Co.*, 678 F.3d 397, 402 (5th Cir. 2012) (quoting 44 C.F.R. pt. 62, app. A; 44 C.F.R. pt. 62, app. A, art III(D)(3)(a)).  The Arrangement requires companies to notify FEMA of litigation expenses and requires FEMA's Office of the Chief Counsel to ensure the litigation is based on actions within the scope of the Arrangement and does not involve agent negligence.  *Id.* (citing 44 C.F.R. pt. 62, app. A; 44 C.F.R. pt. 62, app. A, art III(D)(2)-(3)(a)).  If FEMA's Chief Counsel, along with the Federal Insurance Administrator, determine "that the litigation is grounded in actions by the Company that are significantly outside the scope of the Arrangement, and/or involves issues of agent negligence" the Federal Insurance Administrator has thirty days to inform the insurer that the litigation expenses (in whole or in part) will not be covered.  *Id.* (citing (D)(3)(a)-(d)).  Unless FEMA explicitly notifies the insurance company of its intent not to defend or indemnify, FEMA is presumed to pay the litigation expenses and any resulting damages awards.  *Id.*

In this case, it is undisputed that PIIC has not received any correspondence from the Federal Insurance Administration, FEMA or its Office of General Counsel declaring or suggesting that this case falls outside the "scope' of the Arrangement as that word is used at Article IV(D)(3) of the Arrangement.  (Docs. 20, ¶ 8; 27, ¶ 8).  It is also undisputed that PIIC's legal bills for the defense of this lawsuit have been submitted periodically to FEMA for reimbursement throughout the course of these proceedings, and FEMA has reimbursed PIIC for each of those bills throughout this case.  (Docs. 20, ¶ 7; 27, ¶ 7).  If allowed to proceed, an award of attorneys' fees under SDCL § 58-12-3 based upon a finding that Defendant's refusal to pay full policy benefits was vexatious and without reasonable cause would likewise be paid from the federal treasury.  For these reasons, the Court finds that Plaintiffs' attorney's fees claim under SDCL § 58-12-3 is preempted by federal law.

### 3.  EAJA

Plaintiffs argue that they are entitled to attorney's fees and costs under the Equal Access to Justice Act. (Doc. 26 at 438).  Under the EAJA, courts may award attorney's fees to the prevailing party in a civil case against "the United States or any agency or any official of the United States acting in his or her official capacity. . . ."  28 U.S.C. § 2412.  Several courts that have addressed this issue have concluded that a plaintiff is not entitled to attorney's fees and costs under the EAJA in cases for breach of a SFIP brought against a WYO program insurance carrier because WYO carriers are not considered "agencies" under the EAJA.  *See Dwyer v. Fidelity Nat'l Property & Cas. Ins. Co.*, 565 F.3d 284, 289-90 (5th Cir. 2009) (holding that although a WYO carrier participating in the NFIP is a fiscal agent for the United States, such does not transform the WYO carrier into a federal agency under the EAJA); *McCarty v. Southern Farm Bureau Cas. Ins. Co.*, Civ. No. 5:12-0148, 2013 WL 593636, at *4 (E.D. Ark. Feb. 15, 2013) (citing *Dwyer*, 565 F.3d at 290); *Hampson v. Wright Nat'l Flood Ins. Co.*, Civ. No. 4:19-10083, 2019 WL 8060185, at *2 (S.D. Fla. Aug. 12, 2019) (same).  However, Plaintiffs argue that this Court should instead follow *Shapiro v. Wright National Flood Insurance Co.* which stated that the determining factor in this analysis is not such much whether a WYO carrier is an "agency" of the United States under the EAJA, but rather whether the government is the source of funds for an award of attorney's fees.  *See Shapiro v. Wright Nat'l Flood Ins. Co.*, Civ. No. 2:19-0679, 2020 WL 224538, at *4 (M.D. Fla. Jan. 15, 2020) (citing *Newton v. Capital Assurance Co.*, 245 F.3d 1306, 1312 (11th Cir. 2001) (holding that the no-interest rule prohibits the award of prejudgment interest against WYO companies "because the regulations detailing the financial relationship between FEMA and WYO companies establish that the interest charges against WYO companies are in reality "direct charges against FEMA.")).  The Eighth Circuit Court of Appeals does not seem to have addressed this issue.

WYO companies, rather than FEMA, are initially responsible for the "adjustment, settlement, payment, and defense" of claims on their policies.  *Shapiro*, 2020 WL 224538, at *2 (quoting 44 C.F.R. § 62.23(d)).  "A WYO company choosing to defend against a claim must therefore seek reimbursement for its costs rather than merely handing the case over to FEMA."  *Id.* at *3 (citing *Newton*, 245 F.3d at 1312 (citing 44 C.F.R. § 62.23(9)(6)).  In *Shapiro*, the District Court for the Middle District of Florida construed the defendant's Rule 12(b)(6) motion to dismiss the plaintiff's request for attorney's fees and costs as a motion to strike under Federal Rule 12(f).

*Id.* The court stated that under the federal regulations, whether payment of attorney's fees is a direct charge on federal funds depends upon whether the WYO company seeks reimbursement for its defense costs from FEMA and otherwise has an arrangement with FEMA whereby it is entitled to reimbursement. *Id.* at *4. The court denied the defendant's motion to strike, finding that "it is at least plausible at this point in the litigation that attorney's fees may be paid from federal funds by FEMA." *Id.*

This case is at a later procedural stage than in *Shapiro*. Here, the Court is ruling on a motion for partial summary judgment rather than a motion to dismiss or strike. Even if the Eighth Circuit Court of Appeals were to follow *Shapiro* and conclude that a plaintiff's request for attorney's fees and costs under the EAJA in a lawsuit against a WYO carrier is preempted only if it is shown that such fees and costs are reimbursed by the federal government, the undisputed facts show that Defendant in this case made a demand for reimbursement and that FEMA has been reimbursing Defendant's attorney's fees and costs throughout the litigation. Defendants' motion for summary judgment is granted as to Plaintiffs' request for attorney's fees and costs under the EAJA because in this case, such fees and costs are direct charge on the federal treasury.

### 4. Claims for Judicial Interest

Defendants also move for summary judgment on Plaintiffs' claim of relief for judicial interest because such an award would violate the "no-interest rule." "In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." *Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986). This court joins the many other courts that have examined this issue have concluded that the regulations detailing the financial relationship between FEMA and WYO companies establish that interest charges against WYO companies are direct charges on the public treasury and are therefore barred by the "no-interest rule." *See, e.g.*, *Studio Frames Ltd. v. Standard Fire Ins. Co.*, 483 F.3d 239, 253 (4th Cir. 2007); *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 193 (2d Cir. 2006); *Newton Capital Assurance Co.*, 245 F.3d 1306, 1312 (11th Cir. 2001); *Sandia Oil v. Beckton*, 889 F.2d 258, 261-64 (10th Cir. 1989); *McCarty v. S. Farm Bureau Cas. Ins.*, Civ. No. 5:12-0148, 2013 WL 593636, at *5 (E.D. Ark. Feb. 15, 2013).

### II.   Motion to Quash Jury Demand

A court trial in this case is scheduled to begin on July 26, 2022. (Doc. 35). The Court's initial Rule 16 scheduling order states:

> Plaintiffs also claim punitive damages, and likewise claim the right to a jury trial on the punitive damages. If there is a remaining claim on punitive damages, the Court will then have briefing on the issue of the right to a jury trial for punitive damages. The parties should be aware that it is the Court's preliminary view that Plaintiffs are entitled to a jury trial if there is a remaining punitive damage claim.

(Doc. 15).

Defendants move to quash Plaintiffs' jury demand on the basis that it is U.S. Treasury funds, and not the assets of Defendant, that are at stake in this litigation. (Docs. 21, 22) (citing *Gunter v. Farmers Ins. Co.*, 736 F.3d 768, 773 (8th Cir. 2013) ("In an action involving federal funds, a plaintiff is only entitled to a jury trial if Congress has granted that right by statute.")). Plaintiffs acknowledge that a jury trial is generally unavailable for most of their claims, but argue that they have pleaded extra-contractual claims for negligent and fraudulent procurement of an insurance policy. (Doc. 25 at 417-18). Plaintiffs argue that because federal funds are not at stake with respect to these types of claims, courts regularly permit such claims to be tried to a jury. (Doc. 25 at 417-18). Plaintiffs argue that should the Court "deny Defendant's motion for partial summary judgment on Plaintiffs' extra-contractual claims, then so, too, should the Court deny Defendant's motion to quash Plaintiffs' demand for a jury trial with respect to those same claims." (Doc. 25 at 418).

The Court has granted Defendant summary judgment on Plaintiffs' claims for negligent and fraudulent procurement. As explained above, based on the facts of this case, Plaintiffs' alleged state law tort claims for negligent and fraudulent procurement are preempted by the NFIA. Defendants' Motion to Quash Jury Demand is therefore granted.

Accordingly, it is hereby ORDERED:

1) Defendant's Motion for Partial Summary Judgment (Doc. 17) is GRANTED IN PART AND DENIED IN PART; Defendant's Motion is denied as to Plaintiffs' claims for additional building and contents damages, and is granted in all other respects; and

2) Defendant's Motion to Quash Jury Demand (Doc. 21) is GRANTED.

Dated this _____ day of June, 2022.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

33